UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**VIVA VOYAGE, LLC**   CASE NO.

    **Plaintiff,**

v.

**ROVIA, LLC, WORLDVENTURES MARKETING, LLC, WORLDVENTURES HOLDINGS, LLC, WAYNE NUGENT, AND JERRE FUQUA,**

    **Defendants.**

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Viva Voyage, LLC ("Viva Voyage" or "Plaintiff"), sues Defendants, Rovia, LLC ("Rovia"), WorldVentures Marketing, LLC ("WorldVentures Marketing"), WorldVentures Holdings, LLC ("WorldVentures Holdings"), Wayne Nugent ("Nugent"), and Jerre Fuqua ("Fuqua") (collectively "Defendants"), as follows:

### INTRODUCTION

1. Plaintiff is a seller of travel that prides itself on the highest level of customer service. The company mission is to become the best seller of vacations by redefining the way that they are sold. Viva Voyage was designed to work harder than other travel agencies to make sure that its customers are purchasing the right vacation to match their needs and to provide vacation solutions for its customers with the highest possible value for their vacation dollar.

2. Defendant WorldVentures Holdings is the parent company of dozens of affiliated WorldVentures companies. What all of the affiliated subsidiary companies have in common is

that they are multilevel marketing direct sales companies that market and sell lifestyle membership products and services through their network of representatives.

3. One such affiliated company is WorldVentures Marketing which provides leisure travel services. With a multi-level marketing model, WorldVentures Marketing sells DreamTrips Memberships through a series of part-time and full-time individuals who receive a commission for each membership that is sold.

4. By purchasing a DreamTrips Membership, an individual has the ability to purchase a variety of vacations at a discounted rate. As part of the DreamTrips Membership, an individual can partake in a variety of individual or group trips that are only available to DreamTrips members.

5. When a member inevitably books a trip, it is often done through WorldVentures Marketing's wholly owned subsidiary Rovia.

6. Rovia entered into a three year contract with Plaintiff for Viva Voyage to procure cruise inventory as a licensed travel agent in markets selected by Rovia, to create cruise ship centered trips available to members of organizations or clubs, including DreamTrips, to procure and package cruise inventory to fulfill the cruise needs of Rovia's customers, and to procure travel excursions for Rovia's customers during their trips amongst other related services. The contract between Viva Voyage and Rovia is attached hereto as Exhibit "A" (the "Contract"). The Contract contains a Master Services Agreement ("MSA") and Statement of Work ("SOW").

7. Plaintiff has brought this lawsuit in connection with a number of business torts by Defendants, including defalcations of money that should be held in trust but have been and continue to be utilized for other purposes. By not holding the money in trust, Rovia is violating a number of state and federal Seller of Travel and trust accounting laws.

Case No.:                              .

8.  In addition to being illegal, this conduct greatly endangers the public as money collected by Rovia to pay for a trip is being utilized for other WorldVentures related purposes. This could lead to an individual not being able to go on a trip that they paid for since WorldVentures and Rovia have indicated to Viva Voyage that they are on the verge of becoming insolvent. To protect the public from this conduct is exactly why the various Seller of Travel laws are in place.

9.  As such, Plaintiff seeks injunctive relief to appoint a custodian over Rovia in order to ensure that Defendants abide by various Seller of Travel laws and that Defendants do not continue to endanger the public.

## PARTIES

10.  Viva Voyage, LLC is a Nevada Limited Liability Company. The three members of Viva Voyage are Geoffrey Silvers, Scott Silvers, and Walter Silvers.

11.  Geoffrey Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

12.  Scott Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

13.  Walter Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

14.  Rovia, LLC is a Limited Liability Company whose sole member is WorldVentures Marketing, LLC.

15.  WorldVentures Marketing, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

16.  The two members of WorldVentures Holdings, LLC are Wayne Tillman Nugent and Daniel Louis Stammen ("Stammen").

17.  Nugent is a citizen of Plano, Texas.

18.  Stammen is a citizen of Plano, Texas.

19. Defendants routinely and systemically conduct business within the state of Florida and in this judicial district, including, but not limited to, engaging in business transactions with Plaintiff and routinely selling goods and services to citizens of this state.

## JURISDICTION AND VENUE

20. Plaintiff is seeking from Defendants an amount in excess of $75,000 exclusive of attorneys' fees, interest, and costs, as set forth in more detail below.

21. This Court has subject matter jurisdiction of this cause pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is greater than $75,000 exclusive of fees, interest, and costs.

22. This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(a) and Florida Statute Section 48.193(1)(a)(2) because Defendants committed tortious acts directed towards this state and caused injury in this state.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the injuries caused by Defendants' acts was suffered in this district.

## BACKGROUND AND GENERAL ALLEGATIONS

24. Rovia entered into a three year contract with Plaintiff for Viva Voyage to procure cruise inventory as a licensed travel agent in markets selected by Rovia, to create cruise ship centered trips available to members of organizations or clubs, including DreamTrips (which is owned by WorldVentures Marketing), to procure and package cruise inventory to fulfill the cruise needs of Rovia's customers, and to procure travel excursions for Rovia's customers during their trips amongst other related services.  *See* Exhibit "A".

25. Since the inception of the Contract, Viva Voyage has upheld and complied with each and every one of its material terms.

26. Prior to executing the Contract with Viva Voyage, Rovia was selling a high volume of cruise packages where the vast majority of the packages that they sold were at a loss. To place this in perspective, this means that each cruise package sold by Rovia, the sole source of income for the company, placed the company further into debt.

27. After Viva Voyage took control of Rovia's cruise ship bookings, nearly every cruise booked by Viva Voyage on behalf of Rovia customers has been profitable.

28. Despite this, Rovia has continuously and systematically violated the terms of the Contract as well as interfered with Viva Voyage's business.

29. However, it was Rovia's recalcitrant attitude toward holding its clients' funds in a trust account which necessitated the filing of this action and seeking injunctive relief from this Court in order to protect the public from Rovia's behavior.

30. Since Rovia sells trips to individuals residing in all 50 states, it is required to comply with the Seller of Travel laws for each state (referred to herein as the "Seller of Travel laws").

31. Once a Rovia customer in certain states pays the company for a trip, Rovia is required to maintain that money in a trust account under a variety of Seller of Travel Laws. From there, the money is to be transmitted from the trust account to pay for the trip. The purpose of these laws is to protect the public from fraudulent and negligent behavior.

32. In the instance of a trip booked by Viva Voyage, the money should go from the Rovia trust account directly to Viva Voyage. From there, Viva Voyage would directly pay the company that is offering the trip.

33. Despite this, Viva Voyage has been routinely notified by Rovia representatives that instead of Rovia setting aside client funds that have been paid for a trip, that Rovia utilizes the

funds from new customers to pay for the operating expenses of its parent company, WorldVentures Holdings, or to pay for the trips of earlier customers.

34. This conduct violates a number of state and federal Seller of Travel and trust laws. By virtue of engaging in this illegal behavior, should Rovia have a decrease in the number of trips that it sells, it will be unable to pay for the trips of customers whose funds were used for improper purposes.

35. Viva Voyage was first notified on this conduct by Maria Kozova, the former Chief Financial Officer for Rovia. Viva Voyage learned of this conduct when Viva Voyage reached out to her to determine the reason that payments for trips were being delayed by Rovia and because Rovia employees were telling Viva Voyage that Rovia did not have any money to pay Viva Voyage.

36. Viva Voyage had reached out to Ms. Kozova since Rovia was habitually late in paying Viva Voyage – in fact, its first payment under the Contract in the amount of approximately $50,000 was not timely paid and Rovia ignored numerous requests from Viva Voyage about this issue – and Viva Voyage could not understand how Rovia did not have money to pay Viva Voyage given that all of the trips it booked were paid for by a customer in advance.

37. Due to this conduct, there have been times when Viva Voyage has been forced to advance its own funds, sometimes in excess of $100,000, to meet a deadline to pay for a customer's trip because Rovia had used customer funds for unauthorized purposes and was unable to cover the amount owed for the trip when it came due.

38. Although it is widely known amongst the employees at Rovia that the company engages in this illegal conduct, Fuqua, a Senior Vice President for Travel Products at Rovia, has acknowledged to Viva on numerous occasions that Rovia engages in this activity, that it is illegal

under numerous state and federal regulations for Rovia to engage in this activity, and that Rovia will cease from continuing to engage in the conduct.

39. However, despite these assurances, Rovia continues to use client funds for unauthorized purposes. Due to the current economic environment, and Fuqua's representations to Viva that Rovia is suffering from the recent financial downturn due to COVID-19, Viva's already substantial concerns about this conduct are greatly magnified since Rovia will be unable to pay for pre-purchased vacations in the event that it does not continue to sell new trips.

40. Viva Voyage has also demanded on a number of occasions that Rovia make Viva Voyage the merchant of record for trips that it books. By doing so, Viva Voyage can ensure that the proper trust accounting protocols are abided by. However, Rovia refuses to do so.

41. The reason for the refusal is simple, it would mean the end of Rovia utilizing client funds to support its cashflow needs for other companies under the WorldVentures family of companies.

42. The individuals engaging in this illegal conduct are Rovia, WorldVentures Marketing, and WorldVentures Holdings, Nugent, and Fuqua.

43. Nugent, who sits on the board of all three companies, and is one of two owners of the parent WorldVentures Holdings, is the individual who directs Rovia, through Fuqua, to engage in this improper conduct of transferring the money to WorldVentures Marketing or WorldVentures Holdings instead of having the money remain in a trust account.

44. At the express direction of Nugent; Fuqua, knowing that the conduct violates Seller of Travel laws, refuses to comply with the Seller of Travel laws and personally engages in the torts in his individual capacity by transferring the money coming into Rovia to other WorldVentures companies instead of into a trust account as mandated by the Seller of Travel laws.

45. In addition to the conduct described above being illegal, it also violates Section 10.2.2 of the MSA.

46. Unless the Court appoints an individual to oversee Rovia's financial accounts, it will continue to engage in this illegal conduct with respect to refusing to place client funds in a trust account.

47. Alternatively to a Court ordered individual overseeing the business of Rovia, the Court can make Viva Voyage the merchant of record for all Rovia bookings covered by the Contract so that Viva Voyage can ensure that Rovia does not engage in further defalcations and that no consumers are harmed by Rovia's actions.

## FINANCIAL BREACHES BY ROVIA

**Margin Incentives Withheld by Rovia**

48. Rovia has also failed to uphold its financial obligations under the Contract.

49. Despite numerous requests by Viva Voyage to Rovia for an accounting and payment of the 2019 margin incentive, Fuqua, on behalf of Rovia, has only provided a one-page superficial spreadsheet without any supporting documentation.

50. A final accounting with supporting documentation was requested by Geoff Silvers and Scott Silvers on behalf of Viva Voyage during an in-person meeting with Fuqua in Dallas, Texas in late 2019. At that time, Rovia promised that supporting documentation and a full accounting would be provided on an expedited basis.

51. Despite this representation, and additional representations made to George Lopez from Viva Voyage, Rovia has not provided a final accounting for the 2019 margin incentive or payment of the incentive despite the fact that it was due on January 31, 2020 under the terms of the Contract.

52. Viva once again requested that Rovia provide a final 2019 accounting as well as payment of the 2019 incentive in May, 2020. In response, Rovia took the position for the first time that Viva Voyage did not qualify for the margin incentive because Viva Voyage did not meet both the revenue and margin requirements delineated in the SOW.

53. However, this position ignores that the revenue incentive as well as the margin incentive are separate incentives, and that the margin incentive can be added to the revenue incentive - even if the revenue incentive is 0 - in accordance with Section 5(c)(2) of the SOW.

54. By Viva Voyage's estimates, Rovia owes Viva Voyage between $80,000 and $100,000 for the 2019 margin incentive.

**Commission Withheld by Rovia**

55. Viva Voyage books all trips for Rovia customers on the Virtuoso platform. Virtuoso is the platform that Viva Voyage subscribes to in order to book travel for customers at a discounted rate.

56. In addition to booking trips for Rovia customers through the Virtuoso platform, Viva Voyage books trips for its own customers through the platform.

57. However, since Rovia is set up to receive all commissions from the Virtuoso platform, it is receiving commissions that it is not entitled to receive under the MSA for Viva Voyage's customers that are booked through the platform.

58. Despite a demand to do so, Rovia has failed to provide an accounting of these commissions or to provide the commission money to Viva Voyage.

59. It is believed that Rovia owes Viva Voyage substantial commissions for Viva Voyage customers not covered by the MSA that were booked through the Virtuoso platform.

Case No.: _____.

60. In order to mitigate these damages, Viva will be moving from the Virtuoso platform to a different consortium so that it can receive the commission it is entitled to receive for customers it books that are not covered by the MSA.

**Revelex Fees under the Statement of Work**

61. Rovia has also breached the Contract by failing to pay the required monthly payment for Revelex under the terms of the agreement.

62. In accordance with Section 5(a) to the Statement of Work, Rovia shall pay Viva Voyage:

> "$7,000 plus any actual additional Revelex costs incurred including but not limited to bookings, users or exceeding included page views as listed in pricing on Rovia's current Revelex contract that are incurred automatically or are required to support increased Rovia cruise volume."

63. However, Rovia has only paid $7,000 for the past 20 months and has failed to pay Viva Voyage the associated Revelex fees for each month. The Revelex fees are approximately $7,000 each month making the amount due and owing to Viva Voyage for this breach approximately $140,000.

**Breach of Exclusivity**

64. Rovia has also breached the exclusivity provisions of the MSA.

65. Section 15.5 of the MSA provides: "<u>Exclusive</u>. This engagement of Service Provider for cruise Product and related Services shall be exclusive; Rovia may not engage other travel agencies for the same or similar services and/or the provision of cruise Product."

66. Despite this provision, at the onset of the Contract, instead of exclusively utilizing the services of Viva Voyage for its cruise related needs, Rovia was utilizing the services of a competing company, International Cruises and Excursions ("ICE").

67. By utilizing the services of ICE, which were advertised on the Rovia website, it created confusion amongst the consumer public and Viva Voyage lost bookings as a direct result of the confusion.

**Tortious Interference with an Advantageous Business Relationship**

68. Rovia has also interfered with an advantageous business relationship for Viva Voyage with Allianz Travel Insurance ("Allianz").

69. In 2019, Geoffrey Silvers, on behalf of Viva Voyage, was negotiating with Allianz to obtain approval to provide a highly profitable insurance policy that not all travel companies are approved to sell.

70. The negotiations were progressing favorably and the parties were close to reaching a deal.

71. However, when Rovia's former employee John MacDonald learned of the opportunity, he reached out directly to Allianz to attempt to make a deal for Rovia that would not include Viva Voyage.

72. Of course this ignored that Rovia would have benefitted from the Allianz program had Viva Voyage been approved to sell the insurance.

73. By John MacDonald reaching out directly to Allianz, he soured the deal that was near materialization, and as a result, Allianz refused to continue the negotiations with Viva Voyage.

74. All conditions precedent to this lawsuit have been met or waived.

75. Viva Voyage has retained the undersigned law firm to prosecute the instant lawsuit and has agreed to pay reasonable attorney's fees and costs which Defendants should be responsible for pursuant to controlling law.

Case No.: _____.

**Count I – Appointment of a Custodian over Rovia Pursuant to Fla. Stat. § 605.0704**

76. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

77. Pursuant to Florida Statute Section § 605.0704, the court may appoint a custodian over the assets of a limited liability company to manage its business affairs.

78. As described above, the illegal use of client funds by Rovia is substantially harming the public.

79. Rovia must be enjoined from continuing to engage in the conduct described above and an independent custodian is necessary to ensure that there is not further harm to the public.

**Count II – Conversion (all Defendants)**

80. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

81. Pursuant to the terms of Section 3(a)(ii) of the Statement of Work, "[a]ll funds received through Rovia's merchant account for Product sales following the SOW Effective Date will be payable weekly in arrears to Viva Voyage."

82. However, Defendants have wrongfully deprived Viva Voyage of this property by virtue of the conduct described above.

83. Viva Voyage has been damaged because Defendants have wrongfully deprived it of the funds paid to Rovia through its merchant account as described above.

**Count III – Violation of Florida's Deceptive and Unfair Trade Practices Act (all Defendants)**

84. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

Case No.:                    .

85.  This claim arises under Fla. Stat. §501.201. *et seq*.

86.  Based upon Defendants wrongdoing, they have violated Fla. Stat. §501.204 by using unfair methods in the conduct of trade.

87.  As a direct and proximate result of Defendants unfair and deceptive trade practices, Viva Voyage has suffered damages.

### Count IV – Fraudulent Misrepresentation (Rovia and Fuqua)

88.  Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

89.  Fuqua, a Senior Vice President for Travel Products at Rovia, has acknowledged to Viva Voyage on numerous occasions that Rovia engages in conduct which violates various Seller of Travel Laws and that it is illegal for the company to do so.

90.  Fuqua, individually and on behalf of Rovia, has stated to Geoff Silvers and Scott Silvers that Rovia will cease from continuing to engage in this conduct.

91.  Viva Voyage relied on Fuqua's representations that Rovia would cease from violating the Seller of Travel laws.

92.  However, Fuqua's assurances were false, and Rovia continues to use client funds for unauthorized purposes.

93.  Accordingly, Viva Voyage suffered damages in an amount to be determined at trial.

### Count V – Negligent Misrepresentation (Rovia and Fuqua)

94.  Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

Case No.: 						.

95. Fuqua, a Senior Vice President for Travel Products at Rovia, has acknowledged to Viva on numerous occasions that Rovia engages in behavior which is in violation of various Seller of Travel Laws and that it is illegal for the company to do so.

96. Fuqua, individually and on behalf of Rovia, has stated to Geoff Silvers and Scott Silvers that Rovia will cease from continuing to engage in this conduct.

97. Viva Voyage relied on Fuqua's representations that Rovia would cease from violating the Seller of Travel laws.

98. However, Fuqua's assurances were false, and Rovia continues to use client funds for unauthorized purposes.

99. Accordingly, Viva Voyage suffered damages in an amount to be determined at trial.

**Count VI – Breach of Contract (Illegal Conduct Against Rovia)**

100. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

101. Pursuant to Section 10.2.2 of the MSA, Rovia is prohibited from engaging in illegal activity.

102. Rovia has materially violated this express term of the Contract by engaging in the violations of the Seller of Travel laws described *supra*.

103. Viva Voyage has been damaged as a result of this breach in an amount to be determined at trial.

**Count VII – Breach of Contract (Margin Incentives Against Rovia)**

104. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

LAW OFFICES
BECKER & POLIAKOFF, P.A.
1 EAST BROWARD BLVD., SUITE 1800 • FT. LAUDERDALE, FL  33301
TELEPHONE (954) 987-7550

Case No.:                    .

105. Rovia has materially violated the Contract by refusing to compensate Viva Voyage for its 2019 margin incentive commission.

106. Rovia has taken the position that Viva Voyage did not qualify for the margin incentive because Viva Voyage did not meet both the revenue and margin requirements delineated in the SOW.

107. However, this position ignores that the revenue incentive as well as the margin incentive are separate incentives, and that the margin incentive can be added to the revenue incentive - even if the revenue incentive is 0 - in accordance with Section 5(c)(2) of the SOW.

108. Viva Voyage has been damaged by Rovia's breach in an amount to be determined at trial.

## Count VIII – Breach of Contract (Revelex Fees Against Rovia)

109. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

110. Rovia has materially breached the Contract by failing to pay the required monthly payment for Revelex under the terms of the agreement.

111. In accordance with Section 5(a) to the Statement of Work, Rovia shall pay Viva Voyage:

> "$7,000 plus any actual additional Revelex costs incurred including but not limited to bookings, users or exceeding included page views as listed in pricing on Rovia's current Revelex contract that are incurred automatically or are required to support increased Rovia cruise volume."

112. However, Rovia has only paid $7,000 for the past 20 months and has failed to pay Viva Voyage the associated Revelex fees for each month. The Revelex fees are approximately

LAW OFFICES
BECKER & POLIAKOFF, P.A.
1 EAST BROWARD BLVD., SUITE 1800 • FT. LAUDERDALE, FL  33301
TELEPHONE (954) 987-7550

$7,000 each month making the amount due and owing to Viva Voyage for this breach approximately $140,000.

### Count IX – Breach of Contract (Exclusivity Against Rovia)

113. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

114. Section 15.5 of the MSA provides: "<u>Exclusive</u>. This engagement of Service Provider for cruise Product and related Services shall be exclusive; Rovia may not engage other travel agencies for the same or similar services and/or the provision of cruise Product."

115. Despite this material provision, at the onset of the Contract, instead of exclusively utilizing the services of Viva Voyage for its cruise related needs, Rovia was utilizing the services of a competing company, International Cruises and Excursions ("ICE").

116. By utilizing the services of ICE, which were advertised on the Rovia website, it created confusion amongst the consumer public and Viva Voyage lost bookings as a direct result of the confusion.

117. Viva Voyage was damaged by this conduct in an amount to be determined at trial.

### Count X – Unjust Enrichment (Improperly Held Commissions Against Rovia)

118. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

119. Viva Voyage books all trips for Rovia customers on the Virtuoso platform. Virtuoso is the platform that Viva Voyage subscribes to in order to book travel for customers at a discounted rate.

120. In addition to booking trips for Rovia customers through the Virtuoso platform, Viva Voyage books trips for its own customers through the platform.

121. However, since Rovia is set up to receive all commissions from the Virtuoso platform, it is receiving commissions that it is not entitled to receive under the MSA for Viva Voyage's customers that are booked through the platform.

122. Despite a demand to do so, Rovia has failed to provide an accounting of these commissions or to provide the commission money to Viva Voyage.

123. It is believed that Rovia owes Viva Voyage substantial commissions for Viva Voyage customers not covered by the MSA that were booked through the Virtuoso platform.

124. As a result, Viva Voyage has conferred a benefit upon Rovia since it received commissions that it did not earn.

125. Rovia voluntarily accepted and retained the benefits conferred upon it by Viva Voyage.

126. Under the circumstances, it would be inequitable for Rovia to retain the benefits conferred upon it by Viva Voyage without first paying to Viva Voyage the value of the benefits conferred upon it.

**Count XI – Tortious Interference with Contract (Fuqua, Nugent, WorldVentures Holdings, and WorldVentures Marketing)**

127. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

128. This is a cause of action for damages arising from Fuqua, Nugent, WorldVentures Holdings, and WorldVentures Marketing's tortious interference with an express contract between Viva Voyage and Rovia.

Case No.: .

129. Section 3(a)(ii) of the Statement of Work between Viva Voyage and Rovia provides that "[a]ll funds received through Rovia's merchant account for Product sales following the SOW Effective Date will be payable weekly in arrears to Viva Voyage."

130. Despite this, at the direction of Fuqua, Nugent, WorldVentures Holdings, and WorldVentures Marketing; Rovia does not transmit the funds to Viva Voyage in accordance with Section 3(a)(ii) of the Statement of Work and utilizes the funds for other purposes.

131. Fuqua, Nugent, WorldVentures Holdings, and WorldVentures Marketing are fully aware of the Contract between Viva Voyage and Rovia, and specifically Section 3(a)(ii) of the Statement of Work.

132. Fuqua, Nugent, WorldVentures Holdings, and WorldVentures Marketing intentionally and unjustifiably interfered with the Contract between Viva Voyage and Rovia by forcing Rovia to take actions that are in violation of Section 3(a)(ii) of the Statement of Work.

133. Viva Voyage is and will continue to be damaged by this interference.

**Count XII – Tortious Interference with a Perspective Business Relationship**

134. Viva Voyage re-alleges and incorporates paragraphs 1 through 75 as set forth above.

135. This is a cause of action for damages arising from Rovia's tortious interference with a perspective business relationship with Allianz

136. In 2019, Geoffrey Silvers, on behalf of Viva Voyage, was negotiating with Allianz to obtain approval to provide a highly profitable insurance policy that not all travel companies are approved to sell.

137. The negotiations were progressing favorably and the parties were close to negotiating a deal.

Case No.: _____.

138. However, when Rovia's former employee John MacDonald learned of the opportunity, he reached out directly to Allianz to attempt to make a deal for Rovia that would not include Viva Voyage.

139. By John MacDonald reaching out directly to Allianz, he soured the deal that was near materialization, and as a result, Allianz refused to continue the negotiations with Viva Voyage.

140. Viva Voyage is and will continue to be damaged by this interference.

## DEMAND FOR JURY TRIAL

Viva Voyage demands trial by jury of all issues so triable.

WHEREFORE, Viva Voyage, LLC demands judgment against Defendants, Rovia, LLC, WorldVentures Marketing, LLC, WorldVentures Holdings, LLC , Wayne Nugent, and Jerre Fuqua for:

  i. Compensatory damages, interest, and costs, in an amount to be determined at trial;

  ii. attorneys' fees pursuant to Section 5(a)(2) of the Statement of Work and Fla. Stat. § 501.2105;

  iii. appointment of a custodian over Rovia pursuant to Fla. Stat. § 605.0704; and

  iv. such other relief as the Court deems just and proper.

Case No.:                              .

Dated: May 26, 2020

                              Respectfully submitted
                              BECKER
                              *Attorneys for Plaintiff*
                              1 East Broward Blvd., Suite 1800
                              Fort Lauderdale, FL  33301
                              Telephone:  (954) 987-7550
                              Facsimile:  (954) 985-4176
                              Eberege@beckerlawyers.com
                              Cgellman@beckerlawyers.com

By:_____
          EVAN B. BERGER
          Florida Bar No.  71479